# In the United States Court of Federal Claims

No. 09-158
Filed: January 8, 2010

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| | * | Rails-To-Trails Case; |
| | * | National Trails System Act, |
| | * |   16 U.S.C. §§ 1241-51 *et seq.* (2006); |
| | * | National Trails System Act Amendments |
| | * |   of 1983, Pub. L. No. 98-11, § 208, |
| MARK R. RASMUSON and | * |   97 Stat. 42, 48; |
| BRENDAN S. RASMUSON, *et al.*, | * | Railroad Revitalization and Regulatory |
| | * |   Reform Act of 1976; |
|     Plaintiffs, | * | U.S. Const. Amend V, |
| | * |   Just Compensation Clause; |
| v. | * | 28 U.S.C. § 1491(a)(1) (2006); |
| | * | 45 U.S.C. § 801 (2006); |
|     THE UNITED STATES | * | 49 U.S.C. § 702 (2006); |
| | * | 49 U.S.C. § 10502 (2006); |
|     Defendant. | * | 49 U.S.C. § 10903 (2006); |
| | * | 49 C.F.R. § 1152.29(a), (d)(1); |
| | * | 49 C.F.R. § 1121.4(b); |
| | * | RCFC 20, Permissive Joinder; |
| | * | RCFC 23, Class Certification; |
| | * | RCFC 40.2(b), Indirectly Related Cases. |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Thomas S. Stewart, Elizabeth G. McCulley, Anne E. Baggott, Brent Baldwin, Steven M. Wald,** and **J. Robert Sears**, Baker Sterchi Cowden & Rice, L.L.C., St. Louis and Kansas City, Missouri, Counsel for Plaintiffs.

**Frank J. Singer**, United States Department of Justice, Environmental & Natural Resources Division, Washington, D.C., Counsel for Defendant.

## MEMORANDUM OPINION AND ORDER REGARDING CLASS CERTIFICATION

       This Memorandum Opinion and Order concerns Plaintiffs' request for certification of a class action, pursuant to RCFC 23. For the reasons discussed herein, the court declines to certify a class action at this time, because the court is not satisfied that the numerosity requirement of RCFC 23 has been met. The court, however, reserves the right to consider this issue after further discovery.

I.     THE NATIONAL TRAILS SYSTEM ACT AND AMENDMENTS AND PROCEDURE TO ABANDON A RAILROAD RIGHT-OF-WAY.

The Surface Transportation Board ("STB"), the successor agency to the Interstate Commerce Commission,[1] has authority "to regulate the construction, operation, and abandonment of most railroad lines in the United States." *Caldwell* v. *United States*, 391 F.3d 1226, 1228 (Fed. Cir. 2004). When a railroad seeks to abandon a railroad right-of-way within the STB's jurisdiction, the company "must either: (1) file a standard abandonment application that meets the requirements of 49 U.S.C. § 10903; or (2) seek an exemption, under 49 U.S.C. § 10502." *Id.* If the STB approves a standard abandonment application or grants an exemption . . . the railroad ceases operation, [and] the STB relinquishes jurisdiction over the abandoned railroad right-of-way and state law reversionary property interests, if any, take effect." *Id.* at 1228-29 (citing *Preseault v. Interstate Commerce Commission,* 494 U.S. 1, 7-8 (1990)).

In 1983, Congress amended the National Trails System Act, Pub. L. 90-543, Oct. 2, 1968, 82 Stat. 919 (codified at 16 U.S.C. §§ 1241-51 *et. seq.*), to provide for an alternative process by which a railroad right-of-way could be abandoned. Section 208 of the National Trails System Act Amendments of 1983, Pub. L. No. 98-11, § 208, 97 Stat. 42, 48 (codified at 16 U.S.C. § 1247(d)) ("Trails Act").

In *Caldwell*, the United States Court of Appeals for the Federal Circuit described this process as follows:

Section 8(d) of the Trails Act allows a railroad to negotiate with a state, municipality, or private group (the "trail operator") to assume financial and managerial responsibility for operating the railroad right-of-way as a recreational trail.[2] If the railroad and the trail operator indicate a willingness to

_____

[1] As of January 1, 1996.  49 U.S.C. § 702 (2006).

[2] Section 8(d), codified at 16 U.S.C. § 1247(d), provides:

(d) Interim use of railroad rights-of-way
The Secretary of Transportation, the Chairman of the Surface Transportation Board, and the Secretary of the Interior, in administering the Railroad Revitalization and Regulatory Reform Act of 1976 [45 U.S.C. § 801 *et seq.*], shall encourage State and local agencies and private interests to establish appropriate trails using the provisions of such programs. Consistent with the purposes of that Act, and in furtherance of the national policy to preserve established railroad rights-of-way for future reactivation of rail service, to protect rail transportation corridors, and to encourage energy efficient transportation use, in the case of interim use of any established railroad rights-of-way pursuant to donation, transfer, lease, sale, or otherwise in a manner consistent with this chapter, if such interim use is subject to restoration or reconstruction for railroad purposes, such interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such

negotiate a trail use agreement, the STB stays the abandonment process and issues a notice allowing the railroad right-of-way to be "railbanked." The effect of the notice, if the railroad and prospective trail operator reach an agreement, is that the STB retains jurisdiction for possible future railroad use and the abandonment of the corridor is blocked "even though the conditions for abandonment are otherwise met." [*Nat'l Ass'n of Reversionary Prop. Owners* ("*NARPO*")] v. *STB*, 158 F.3d 135, 139 (D.C.Cir.1998); *see also Preseault* 494 U.S. at 8.] Specifically, section 8(d) provides that "such interim use [for trails] shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." 16 U.S.C. § 1247(d). Thus, section 8(d) of the Trails Act prevents the operation of state laws that would otherwise come into effect upon abandonment-property, laws that would "result in extinguishment of easements for railroad purposes and reversion of rights of way to abutting landowners." *Rail Abandonments-Use of Rights-of-Way as Trails*, Ex Parte No. 274 (Sub-No. 13), 2 I.C.C.2d 591, 1986 WL 68617 (1986).

391 F.3d at 1229-30 (internal and parallel citations omitted).

This alternative abandonment process, known as "railbanking," begins "when a rail carrier files an abandonment application [with the STB] or, as in this case, a request for an exemption." *Caldwell*, 391 F.3d at 1228 (citing *NARPO*, 158 F.3d at 139). If the STB approves a railroad's request for an exemption, a notice of exemption will be published in the Federal Register notifying the public of the railroad's intent to abandon the railroad right-of-way. *Id.* (citing 49 C.F.R. § 1121.4(b)). A potential trail operator may then file a petition, pursuant to 49 C.F.R. § 1152.29(a), that it is interested in acquiring or using the right-of-way. 49 C.F.R. § 1152.29(a)[3] If the petition meets certain criteria, and the railroad agrees to negotiate with the potential trail operator, the STB will issue a Notice of Interim Trail Use or Abandonment ("NITU"). 49 C.F.R. § 1152.29(d). The NITU "permits the railroad to

---

rights-of-way for railroad purposes. If a State, political subdivision, or qualified private organization is prepared to assume full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use, and for the payment of any and all taxes that may be levied or assessed against such rights-of-way, then the Board shall impose such terms and conditions as a requirement of any transfer or conveyance for interim use in a manner consistent with this chapter, and shall not permit abandonment or discontinuance inconsistent or disruptive of such use.

[3] 49 C.F.R. § 1152.29(a) provides in relevant part:

If any state, political subdivision, or qualified private organization is interested in acquiring or using a right-of-way of a rail line proposed to be abandoned for interim trail use and rail banking pursuant to 16 U.S.C. 1247(d), it must file a comment or otherwise include a request in its filing (in a regulated abandonment proceeding) or a petition (in an exemption proceeding) indicating that it would like to do so.

discontinue service, cancel tariffs, and salvage track and other equipment, 'consistent with interim trail use and rail banking' without consummating an abandonment and the NITU extends indefinitely to permit interim trail use once an 'agreement' is reached between the railroad and the trail operator." *Caldwell*, 391 F.3d at 1230 (citing 49 C.F.R. § 1152.29(d)(1)).

If the potential trail operator and the railroad reach an agreement "the NITU extends indefinitely for the duration of recreational trail use[,] subject to the trail operator's fulfillment of its agreed-upon obligations." *Id*. The STB, however, "retains jurisdiction for possible future railroad use, and state law reversionary interests that would normally vest upon abandonment are blocked." *Id*.

## II.    RELEVANT FACTS.[4]

In 1886, the Mason City & Ft. Dodge Railroad established a 15.14-mile right-of-way between milepost 2.0 near Flint, Iowa and milepost 17.14 near Thornton, Iowa (Cerro Gordo County), known as the "Thornton Industrial Lead." Pl. Mem. at 2; Pl. Ex. A. This right-of-way was achieved by the railroad obtaining easements from fee owners adjacent to property now owned by Plaintiffs and putative class members. *Id*. Subsequently, the Union Pacific Railroad Company ("UP") assumed ownership of these easements. *Id*. Plaintiffs claim these easements cross "more than 120 parcels of land with more than 50 fee owners as successors in title to the original fee owners." Pl. Mem. at 2.

On February 11, 2005, UP filed a Petition with the STB, pursuant to 49 U.S.C. § 10502, for an exemption to abandon the Thornton Industrial Lead. Pl. Ex. A. Notice of UP's Petition was published in the Federal Register on March 3, 2005. 70 FED. REG. 10,477 (March 3, 2005). Thereafter, the Iowa Trails Council[5] filed a Petition for issuance of an NITU. *Id*. On June 1, 2005, the STB issued an NITU for the Thornton Industrial Lead, ("Thornton NITU"). *Id*.; *see also Pac. R.R. Co.--Abandonment Exemption--In Cerro Gordo County IA*, STB Docket No. AB-33 (Sub-No. 225X), 2005 WL 1304511 (S.T.B.) (decided May 31, 2005). On or before October 5, 2006, UP and the Iowa Trails Council entered into a Trail Use Agreement ("TUA"), regarding the Thornton NITU. Pl. Mem. at 3, Ex. C. Under the TUA, UP's interest in the Thornton Industrial Lead was transferred to the Iowa Trails Council. Pl. Mem. at 3, Pl. Ex. C.

---

[4] The relevant facts were derived from the parties' filings that are either undisputed or adequately substantiated for purposes of ruling on a RCFC 23 Motion for Class Certification. Factual disputes between the parties are explicitly noted herein.

[5] The Iowa Trails Council "is a non-profit organization which is directed and operated by a diverse group of volunteers, all dedicated to preserving natural resources and providing linear open spaces for public use." http://www.ncrail-trails.org/ITC/itcboard.htm (last visited January 8, 2010).

III.   **PROCEDURAL HISTORY IN THE UNITED STATES COURT OF FEDERAL CLAIMS.**

On March 12, 2009, a Complaint was filed in the United State Court of Federal Claims, pursuant to 28 U.S.C. § 1491(a)(1) ("Tucker Act"), alleging that Plaintiffs and all putative class members own reversionary property rights to real estate that underlie or abut the Thornton Industrial Lead, and by operation of the National Trails Act, 16 U.S.C. § 1247(d), the Government took these property rights without Just Compensation, as required by the Fifth Amendment of the United States Constitution.  Compl. ¶¶ 8-9.

On April 16, 2009, Plaintiffs filed a First Amended Complaint to add 15 named Plaintiffs ("First Am. Compl.").   On May 5, 2009, the Government filed an Unopposed Motion For Extension of Time To Answer that was granted by the Honorable Marian Blank Horn.  On May 7, 2009, Plaintiffs filed a Second Amended Complaint ("Sec. Am. Compl."), together with Exhibits to document Plaintiffs' ownership of property underlying or adjacent to the Thornton Industrial Lead.

On May 14, 2009, Plaintiffs filed a Motion To Certify Class, pursuant to RCFC 23, naming "themselves as representatives for that class of similarly situated individuals or entities whose 'reversionary' rights to their property in Cerro Gordo, Iowa, abutting or underlying the abandoned railroad easement [the Thornton Industrial Lead] was precluded by operation of the Trails Act and the STB's issuance of the [Thornton] NITU."  Pl. Mem. at 4.

On May 21, 2009, this case was transferred from the Honorable Marian Blank Horn to the undersigned judge.

\*   \*   \*

On May 31, 2009, the Government filed a Motion For Extension Of Time To File A Response to Plaintiffs' May 14, 2009 Motion To Certify Class, that the court granted on June 1, 2009.  On June 8, 2009, the Government filed an Answer to Plaintiffs' Second Amended Complaint.  On June 12, 2009, the parties filed a Joint Motion To Stay Briefing On The Motion For Class Certification, until a Scheduling Order was finalized.  On June 15, 2009, the court granted that stay.  On August 20, 2009 the court entered a Scheduling Order lifting the stay.

On August 28, 2009, the Government filed a Response To Plaintiffs' May 7, 2009 Motion To Certify Class. ("Gov't Resp.").  On August 31, 2009, Plaintiffs filed a Reply ("Pl. Reply").  On September, 28, 2009, at the request of the court the parties filed a Joint Status Report to apprise the court of other Iowa "rails-to-trails" cases pending in the United States Court of Federal Claims as indirectly related cases under RCFC 40.2(b).

On December 4, 2009, with leave of the court, the Government filed a Surreply To Plaintiffs' Motion To Certify Class ("Gov't Surreply").  On December 8, 2009, Plaintiffs filed a Reply (Pl. Reply to Sur.").

## IV.     DISCUSSION.

### A.     Jurisdiction.

The Tucker Act provides that the United States Court of Federal Claims has jurisdiction over "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).  The Tucker Act, however, does not, by itself, confer jurisdiction on the court.  *United States* v. *Testan*, 424 U.S. 392, 398 (1976) ("The Tucker Act, of course, is itself only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages.  The Court of Claims has recognized that the Act merely confers jurisdiction upon it whenever the substantive right exists.").  Therefore, a plaintiff must identify an independent basis by way of a contract, federal statute, regulation, or the Constitution upon which it is entitled to monetary payment from the federal government.  *United States* v. *Mitchell*, 463 U.S. 206, 216-17 (1983) ("The claim must be one for money damages against the United States and the claimant must demonstrate that the source of substantive law he relies upon can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained.") (internal citations omitted); *Fisher* v. *United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) ("[I]n order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages. In the parlance of Tucker Act cases, that source must be money-mandating.") (internal citations and quotations omitted).

In determining whether the United States Court of Federal Claims has jurisdiction over a claim, the trial court has been instructed that "at the outset [the court] shall determine . . . whether the Constitutional provision, statute, or regulation is one that is money-mandating.  If the court's conclusion is that the Constitutional provision, statute, or regulation meets the money-mandating test, the court shall declare it has jurisdiction over the cause, and shall then proceed with the case in the normal course."  *Fisher*, 402 F.3d at 1173.

The court has jurisdiction to adjudicate the claims in the May 7, 2009 Second Amended Complaint that identify and plead an independent right to money damages under the Fifth Amendment.  Sec. Am. Compl. ¶ 2; *see also Acceptance Ins. Companies Inc*. v. *United States*, 503 F.3d 1328, 1336 (Fed. Cir. 2007) ("A Fifth Amendment takings claims falls within the Tucker Act's grant of jurisdiction[,] because it is a claim against the United States founded upon the Constitution."); *see also Caldwell*, 391 F.3d at 1233-34 ("The issuance of the NITU is the only *government action* in the railbanking process that operates to prevent abandonment of the corridor and to preclude the vesting of state law reversionary interests in the right-of-way.") (emphasis in original).  Therefore, takings claims, if any, accrue upon the issuance of the NITU.  *Id*. at 1234 ("We therefore hold that the appropriate triggering event for any takings claim under the Trails Act occurs when the NITU is issued.").  The trail operator and the railroad must to come to any agreement within 180 days of the NITU's issuance.  49 C.F.R. § 1152.29(d)(1) (stating that the NITU will "permit the railroad to fully abandon the line if no agreement is reached 180 days after it is issued[.]").

**B.      Standard Of Review On A Motion For Class Certification.**

Class actions in United States Court of Federal Claims are governed by RCFC 23 that provides:

> (a) Prerequisites.  One or more members of a class may sue as representative parties on behalf of all only if:
>
> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.
>
> (b) Class Actions Maintainable.  A class action may be maintained if RCFC 23(a) is satisfied and if . . . (2) the United States has acted or refused to act on grounds generally applicable to the class; and (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by class members; ... and (D) the likely difficulties in managing a class action.

RCFC 23(a), (b).

RCFC 23 is modeled after Federal Rule of Civil Procedure ("FRCP") 23.  RCFC 23, United States Court of Federal Claims Rules Committee ("Rules Committee") Notes (2002 Revision).[6]   In *King* v. *United States*, 84 Fed. Cl. 120 (2008), the United States Court of Federal Claims held that: RCFC 23 is different from FRCP 23 in two important respects: "(1) [RCFC 23] has been modified to reflect the court's jurisdiction, in particular, the narrow circumstances in which the court will afford declaratory or injunctive relief, and (2) it allows only 'opt-in,' but not 'opt-out,' class actions." *Id.* at 123.[7]

---

[6] Accordingly, the United States Court of Federal Claims has relied on other federal court decisions to construe RCFC 23.  *Haggart* v. *United States*, 2009 WL 3152383 at 3 (Fed.Cl.2009) ("Cases applying [FRCP 23] have been examined and followed in interpreting RCFC 23."); *see also Barnes* v. *United States*, 68 Fed. Cl. 492, 494, n.1 (2005) ("Owing to the fact that the language of RCFC 23 and Federal Rule 23 is, in many regards, identical, this opinion relies upon numerous decisions that have construed the relevant portions of the latter rule.").

[7] According to the United States Court of Federal Claims in *Buchan* v. *United States*, 27 Fed. Cl. 222, 223 (1992), opt-in class action "allows each of the unnamed members of the

Accordingly, "unidentified claimants are not bound if the case should be ruled in the defendant's favor."[8] *Id.*

The Rules Committee also has observed that "[i]n the main, [RCFC 23] adopts the criteria for certifying and maintaining a class action as set forth in *Quinault Allottee Ass'n* v. *United States*, 453 F. 2d 1272 (1972)." RCFC 23 Rules Committee Notes (2002). Therefore, to certify as a class under *Quinault*, Plaintiffs, in this case, must: (1) constitute a large, but manageable class; (2) there is a question of law common to the whole class; (3) this common legal issue must predominate over any separate factual issues affecting the individual members; (4) the claims of the named plaintiffs are typical of the claims of the class; (5) the Government acted on grounds generally applicable to the whole class; (6) the claims of many putative class members are so small that it is doubtful that they would otherwise be pursued; (7) the current plaintiffs will fairly and adequately protect the interests of the class, without conflict of interest; and (8) the prosecution of individual actions by members of the class, some in district courts and some in this court, would create a risk of inconsistent or varying adjudications.[9] *Id.* at 1276.

The criteria set forth in RCFC 23(a) and (b) "can be grouped into five categories: (i) **numerosity**-a class so large that joinder is impracticable; (ii) **commonality**-in terms of the presence of common questions of law or fact, the predominance of those questions, and the treatment received by the class members at the hands of the United States; (iii) **typicality**-that the named parties' claims are [typical] of the class; (iv) **adequacy**-relating to fair representation; and (v) **superiority**-that a class action is the fairest and most efficient way to resolve a given set of controversies." *Barnes*, 68 Fed. Cl. at 494 (bolded in original) (citing *General Telephone Co. of Southwest* v. *Falcon*, 457 U. S. 147, 161 (1982) (regarding Fed R. Civ. P. 23(a), (b)). Since these requirements are in the conjunctive, failure to satisfy any one "is fatal to a motion for class certification." *Testwuide* v. *United States*, 56 Fed. Cl. 755, 761 (2003).

For this reason, the party moving for class certification bears the burden of establishing, by a preponderance of the evidence, the requirements set forth in RCFC 23. *Filosa* v. *United States*, 70 Fed. Cl. 609, 615 (2006) ("The party moving for class certification bears the burden of satisfying the requirements set forth in RCFC 23 by a preponderance of the evidence."); *see also Eisen* v. *Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974) (in determining whether the requirements of class certification are met, the trial court must not

---

class the opportunity to appear and include themselves in the suit if each is willing to assume the risks of the suit. This approach resembles permissive joinder in that it requires affirmative action on the part of every potential plaintiff." *Id.* at 223.

[8] In contrast, in an opt-out class, "members may choose to exclude themselves if they do not want to be bound by the decision or settlements reach in the case." BLACK'S LAW DICTIONARY 284 (9th ed. 2009).

[9] This eighth factor is no longer relevant in light of the creation of the United States Court of Appeals for the Federal Circuit, that has jurisdiction to review all appeals from the United States Court of Federal Claims, regarding cases alleging the right to money damages against the United States. *King*, 84 Fed. Cl. at 123, n. 3.

inquire: "whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of the class action rule are met."). Bare allegations do not satisfy plaintiff's burden under RCFC 23.

Therefore, in this case, the court is required to conduct an analysis to determine if the prerequisites of RCFC 23 have been satisfied by a preponderance of the evidence. *Falcon,* 457 U.S. at 161 (holding that class actions "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied."). This analysis requires the court to "make the factual and legal inquiries necessary to ensure that class certification is appropriate." *Christopher Village* v. *United States*, 50 Fed. Cl. 635, 642 (2001).

### C.    Plaintiffs' Motion To Certify A Class Action.

#### 1.    Plaintiffs' Argument.

Plaintiffs argue that the number of potential class members is a "major consideration," when assessing the practicality of joinder for numerosity. Pl. Mem. at 6 (quoting *Fauvergue*, 86 Fed. Cl. 82, 96 (2009) (appeal argued Dec. 11, 2009)). Plaintiff relies on *King* for the proposition that a proposed class size that exceeds forty members is presumed to render joinder impracticable. *Id.* In this case, a search of the relevant property records reveals that, at least 120 parcels of land are adjacent to the Thornton Industrial Lead. *Id.* at 6-7. Because some individuals or entities appear to own more than one parcel, however, Plaintiffs estimate that, at least, 50 potential class members exist. *Id.* at 7. Accordingly, Plaintiffs assert the size of the potential class exceeds 40 potential plaintiffs, rendering joinder impracticable. *Id.*

Plaintiffs also contend that a finding of numerosity is warranted when, the size of the individual claims are small in relation to the cost of litigation, so that class members likely would hesitate to pursue their claims individually. *Id.* In this case, Plaintiffs insist that, without a class action, some individual claims may not be pursued at all, because their claims involve small amounts of money, or some potential class members own parcels that are relatively small, while others own larger tracts that are rural in character and consequently of lower value. *Id.* Therefore, a class action is the only procedural vehicle by which all class members can have their respective claims adjudicated. *Id.*

#### 2.    The Government's Response.

The Government responds that Plaintiffs' Motion To Certify fails to satisfy the numerosity requirement. Gov't Resp. at 1. First, Plaintiffs failed to meet their evidentiary burden as to size and composition of the class. *Id.* Second, Plaintiffs failed to establish that joinder of potential plaintiffs is impracticable. *Id.*

The Government does not dispute that the number of potential class members may exceed 50 members, but Plaintiffs have provided "no competent evidence" that a search of all relevant property records occurred. *Id.* Importantly, the list of potential class members provided appears overbroad, as it identifies parties who allegedly own land *adjacent* to the

Thornton Industrial Lead, without regard for the nature of the parties' interest in the property. *Id.* at 7.  Under Iowa law, simply owning property adjacent to a railroad right-of-way is not sufficient to establish the requisite reversionary interest necessary to sustain a takings claim: "To establish a compensable interest in a railroad line under Iowa law, Plaintiffs must prove either: (1) that each held some enforceable reversionary or executory interest in the railroad line; or (2) that each holds title to land adjacent to an abandoned portion of a railroad line that the operator used under a mere easement." *Id.* (citing *Jacobs* v. *Miller*, 111 N.W.2d 673, 675-76 (Iowa 1961); *see also* Iowa Code § 327G.77 (2009)).

Second, Plaintiffs have failed to supply "evidence establishing or even suggesting" that the claims of some potential class members are too small to make individual litigation worthwhile. *Id.* at 7.  Some evidence is required. *Id.*

Third, assuming *arguendo* that Plaintiffs can establish a potential class of approximately 50 members, a class size in this range is not, without more, sufficient to satisfy the numerosity requirement. *Id.* at 8.  The United States Court of Federal Claims has managed cases with more than 50 claimants through joinder. *Jaynes* v. *United States*, 69 Fed. Cl. 450, 454-55(2006) (finding that an estimated 258 members did not satisfy numerosity); *see also O'Hanlon* v. *United States*, 7 Cl. Ct. 204, 206 (1985) (holding 39 potential members was not sufficient); *Suanooke* v. *United States*, 8 Cl. Ct. 327, 333 (1985) (holding 50 potential members was not sufficient).  In short, there is no presumption, as a matter of law, that numerosity is satisfied when the putative number of class members exceeds 40.  Gov't Resp. at 9.  Nor have Plaintiffs cited any authority either in the United States Supreme Court or the United States Court of Appeals for the Federal Circuit establishing such a presumption. *Id.* For this reason, contrary to Plaintiffs' assertion, there is no specific 'magic number' that once achieved raises a presumption of numerosity. *Id.* (citing *Fauvergue*, 86 Fed. Cl. at 98). Plaintiffs' argument that numerosity is presumptively satisfied by identifying more then 40 potential class members has no support in law. *Id.*

In addition, joinder is not impracticable in this case, because the potential plaintiffs are in close geographic proximity to each other and easily identified. *Id.* at 9.  In fact, according to Plaintiffs' initial disclosures, the majority of potential plaintiffs are located within Cerro Gordo County, Iowa and can be ascertained through available deeds and other recorded property instruments. *Id.* at 9-10.  Accordingly, Plaintiffs' Motion To Certify Class should be denied, because joinder is practicable. *Id.* at 10-11.

### 3.    Plaintiffs' Reply.

Plaintiffs reply that, in determining whether the prerequisite of numerosity has been met, the court must assume the truth of the factual allegations contained in the Complaint.  Pl. Reply at 2 (citing *East Texas Motor Freight Sys. Inc.*, v. *Rodriguez*, 431 U.S. 395, 405-06 (1977)).  The allegations in the March 12, 2009 Complaint, conform with Plaintiffs proposed class, defined as follows:

> All persons who own an interest in lands constituting part of the railroad corridor or right-of-way that is locally known as the Thornton Industrial Lead

and on which a rail line was formerly operated by the Union Pacific Railroad Company in Cerro Gordo, Iowa, and who claim a taking of their rights to possession, control, and enjoyment of such lands due to the operation of the railbanking provisions of the National Trails System Act ("NTSA"), 16 U.S.C. § 1247(d) by the issuance of a Notice of Interim Trail Use issued on June 1, 2005, by the Surface Transportation Board. The segments of the subject right-of-way at issue are described as located between milepost 2.0 near Flint to milepost 17.14 near Thornton, in Cerro Gordo County, Iowa.

*Id*. at 2-3.

Therefore, Plaintiffs insist the elements of numerosity have been satisfied. First, there is no minimum number required to maintain a class action suit, joinder is "*generally presumed*" impracticable when the proposed class size exceed 40 members. *Id*. at 3. (emphasis in original) (citing *King*, 84 Fed. Cl. at 124 ("But, generally, if there are more than forty potential class members, this prong has been met.")). Second, Plaintiffs need not specify an exact number of potential class members; instead Plaintiffs need only assert that the putative class number is based on something more than mere speculation. *Id*. at 4. In this case, Plaintiffs have identified over 50 potential class members through a search of the records of the Cerro Gordo County Tax Assessor and Recorder of Deeds. *Id*. Plaintiffs attached an August 27, 2009 Affidavit from Ms. Barbara Moreau, an employee of Cerro Gordo Abstract Company, who was contracted by Plaintiffs to conduct this records search. *Id*. at 4-5 (citing Pl. Reply at Ex. A). In Ms. Moreau's affidavit, she stated that her research identified at least 50 potential class members. *Id*. Therefore, Plaintiffs have provided an adequate basis for identifying potential class members that exceeds the presumptive number of class members necessary for certification as set forth in *King*.

It is important for the court to recognize that, Plaintiffs' have moved to certify a class of adjacent landowners affected by the NITU, not just those adjacent landowners affected by the NITU who also have a reversionary interest in the right-of-way at issue. Pl. Reply at 5. The Government is correct that Plaintiffs have not yet established that all adjacent landowners had a reversionary interest in the Thornton Industrial Lead. *Id*. at 5. Possession of a reversionary interest, however, is not the issue before the court. *Id*. To determine who has a reversionary interest at this juncture would be a *de facto* determination of the merits of the case "under the guise of the numerosity prerequisite." *Id*. Plaintiffs' search of Cerro Gordo County property records reveals that potential plaintiffs are *not* all located in same geographic area. As indicated in Ms. Moreau's Affidavit, potential plaintiffs are dispersed across five different states. *Id*. at 6. Potential class members are located not only in cities throughout Iowa, but also in Texas, Michigan, and Ohio. *Id*. Therefore, the fact that potential plaintiffs geographically are dispersed favors a finding of numerosity. *Id*.

The property at issue also is largely agricultural land of various sizes and easement encumbrances, so that the cost of the litigation would greatly exceed the value of any individual claim. *Id*. at 7. Because the smaller value of some of the potential claims, a class action is the only procedure that makes the litigation cost-effective. *Id*. (citing *Barnes*, 68 Fed. Cl. at 499-500).

In sum, the nature of the suit makes class action superior to other methods of adjudication, because a class action eliminates inconsistent outcomes and promotes judicial economy. *Id*. at 7-8. Instead of multiple counsel and experts, a class action in this case will allow for one counsel and a common group of experts. *Id*. at 8. Efficiency will be achieved by a unified approach to property records and appraisal values. *Id.* In addition, class certification inures to the Government's benefit, because it allows the Government to present one defense to Plaintiffs' claims. *Id*. Pursuant to 28 U.S.C. § 2412, the Government is required to pay attorneys fees and costs, if Plaintiffs are successful. *Id*. Therefore, the Government's potential expense may be significantly reduced in a class action where there is only one counsel and one set of experts, rather than potentially being liable for attorney fees and costs associated with 50 separate actions. *Id*.

Finally, RCFC 23 should be liberally construed, because it is "simply a procedural tool" that provides the most efficient means for potential class members to have their claims adjudicated. *Id*. at 8-9. Because putative class members did not hire an attorney or file suit, many likely do not know such a suit has been filed. *Id*. at 10. Because class certification orders must be published, that will afford the best means of notice to potential claimants. *Id*. at 10 (citing RCFC 23 (c)(1)(B)). RCFC 23 also imposes special burdens on the class counsel and requires the court to take a greater role in the management of the case. *Id*. (citing RCFC 23(d)-(g)). For example, the court must appoint competent class counsel to ensure that class members are given adequate notice of the suit and the potential consequences of opting into the class or pursing litigation individually. *Id*. Furthermore, "[i]t is the ultimate judgment, not the complaint, which finally identifies the class members[.]" *Id*. at 9 (citing RCFC 23(c)(2))(b)(v)).

The Government's attempt to abort this class action, because of numerosity, would result in "dire consequences for citizens with claims against the Government," and as such is antithetical to the purpose of class actions in the United States Court of Federal Claims. *Id*. at 10. Instead, construing RCFC 23 liberally serves this purpose, by providing "a superior mechanism for fairly resolving similar issues and claims with repetitious and wasteful litigation." *Id*. at 11. In this case, approximately 50 potential plaintiffs have claims that would otherwise be too small to pursue individually. *Id*. Therefore, a class action is the only method that effectively and efficiently to affords these potential plaintiffs the opportunity to adjudicate their claims. *Id*.

### 4.      The Government's Surreply.

The Government counters that Plaintiffs have misstated the standard for class certification. Gov't Surreply at 1. The court does *not* have to assume the truth of the factual assertions contained in the Complaint, as required by RCFC 12(b). *Id*. Instead, under RCFC 23, Plaintiffs have the burden to establish, by a preponderance of the evidence, that a class action meets all of the requirements of certification. *Id*. (quoting *Fauvergue*, 86 Fed. Cl. at 95-96). For this reason, RCFC 23 motions "require the court to look beyond the mere allegations of the Complaint and test the sufficiency of the assertions in support of certification." *Id*. For this reason, *East Texas Motor* does not support Plaintiff's position that

the court must to certify any class actions, but instead only those cases that meet the requirements of Fed. R. Civ. P. 23. *Id.* (citing *East Texas Motor* 431 U.S. at 405-06 (holding that a complaint's bare assertions alone were insufficient for certification)). Although other judges of the United States Court of Federal Claims may have certified class actions in different "rail-to-trails" cases,[10] in this case, the court is required to pay attention to the requirements of RCFC 23 on a case-by-case basis. *Id.* at 3. Accordingly, the Government's stipulation to class certification in other cases is of no substantive import here. *Id.*

The Surreply provides that Plaintiffs have failed to provide competent evidence about the value of each of the proposed members' claims and no evidence supports Plaintiffs' assertion that some members of the class would have claims too small to warrant individual litigation. *Id.* at 3-4. Moreover, all but four of the potential class members are located outside of Iowa, so determining their identity and contact information militates against a finding of numerosity. *Id.* at 8

Moreover, Plaintiffs' method for identifying 50 or more potential class members is flawed, because all individuals who own land *adjacent* to the Thornton Industrial Lead were included, without regard to whether such individuals have an ownership interest in the railroad right-of-way at issue in this case. *Id.* at 4. As a result, Plaintiffs' proposed class is too broad. *Id.* Instead, the appropriate reviewing forum should consider only the number of owners in the railroad right-of-way to determine numerosity, not only adjacent landowners. *Id.* at 4-5. All of the evidence cited by Plaintiffs' to establish the size of the proposed class concerns only the total number of adjacent landowners, although ownership of adjacent land alone, without more, does not convey a property right to the right-of-way. *Id.* at 6. In other words, the flawed methodology used to establish Plaintiffs' proposed class is overbroad and "too coarse to establish numerosity." *Id.* at 5.

Although Plaintiffs attempt to rectify their estimate by recasting the definition of the class as consisting of adjacent landowners affected by the NITU, only those property owners with an interest in the right-of-way would be affected by the NITU. *Id.* Plaintiffs, however, do not explain how an adjacent landowner who has no reversionary interest in the right-of-way could be affected by the NITU. *Id.* Therefore, the size of the proposed class "cannot be surmised merely by counting the number of all landowners adjacent to the corridor." *Id.* at 7.

Moreover, there is no merit to the assertion that the court should defer ruling on the number of individuals with an ownership interest in the right-of-way until some later date. *Id.* The prerequisites of RCFC 23 require the court to make findings, even if they overlap with issues on the merits. *Id.* (citing *Gariety* v. *Grant Thornton, LLP.*, 368 F.3d 356, 365 (4th Cir. 2004) ("[T]he factors spelled out in Rule 23 must be addressed through findings, even if they overlap with issues on the merits.")); *Szabo* v. *Bridgeport Machs., Inc.*, 249 F.3d 672, 675 (7th

---

[10] *Burgess* v. *United States*, No. 09-242L (Fed. Cl.) (Sept. 19, 2009) (defining the class as "all persons owing an interest in lands constituting part of" the relevant railroad right-of-way); *see also Jenkins* v. *United States*, No. 09-241L (Fed. Cl.) (Nov. 13, 2009) (defining the class as all persons who "owned an interest in property abutting or underlying the railroad corridor or right-of-way.").

Cir. 2001) (holding that nothing "in *Eisen*, [which proscribes an inquiry into the merits of a suit to determine if class certification is appropriate] prevents the district court from looking beneath the surface of a complaint to conduct the inquiries identified in [FRCP 23] and exercise the discretion it confers.")).  In sum, the Government is not depriving citizens of a forum for vindicating their rights.  *Id.*  Plaintiffs Motion To Certify should be denied because the proposed class is not so numerous that joinder is impracticable.  *Id.*

### 5.    Plaintiff's Reply To The Government's Surreply.

Plaintiffs reply that "[s]imply put if there are 40 potential class members, then the numerosity requirement is presumed."  Pl. Reply to Sur. at 1 (citing *King* and *Barnes*). Plaintiffs do not refute the Government's contention that a motion to certify a class action requires the court to look beyond the allegations of the complaint and test the sufficiency of the assertions in support of certification, but Plaintiffs have satisfied that burden by supplying the August 27, 2009 Moreau Affidavit that identifies the members of the proposed class.  *Id.* at 2.  As a matter of law, Plaintiffs are not required to allege the exact number or identity of the class members, but only supply a basis for asserting the number of putative class members.  *Id.* (citing *King*, 84 Fed. Cl. at 124).

The Government's argument about the value of potential class members' claims is irrelevant, because *Barnes* held that it is appropriate to consider reduced land values when making a decision to certify a class action.  *Id.* at 3 (citing 68 Fed. Cl. at 492).  The fact that potential class members are dispersed across five states does not undermine a finding of numerosity.  *Id.* at 6.

In addition, the Government has stipulated in other rails-to-trails cases pending before the United States Court of Federal Claims that the class includes all persons who own an interest in land adjacent to the railroad right-of-way, at the time the NITU was issued and allege a taking of their property.  *Id.* at 4.  The Government's attempt to require the court to find a reversionary interest at this stage of the litigation is an improper determination on the merits.  *Id.*  At the appropriate time, Plaintiffs will supply evidence that the entire Thornton Industrial Lead was obtained through condemnation or right-of-way deed and that both are easements under Iowa law.  *Id.* at 6.  A motion to certify class action under RCFC 23 does not require Plaintiff to establish liability.  *Id.* at 5-6.

Finally, the Government does not contest that RCFC 23 is to be liberally construed or that a class action is simply a procedural tool for allowing the court to efficiently resolve the claims of many individuals.  *Id.* at 6-7.  Accordingly, a denial of Plaintiffs' Motion To Certify Class would, in effect, deprive citizens of a forum to vindicate their rights.  *Id.* at 7.

### D.    Court's Resolution As To Numerosity.

Even under a liberal construction, Plaintiffs have the burden to establish, by a preponderance of the evidence, that the parties are *so* numerous that joinder is impracticable. RCFC 23(a)(1) (emphasis added).  While "'impracticable,' does not mean 'impossible'", *Haggart*, 89 Fed. Cl. at 530, the standard remains high.  "Impracticable" means "*impossible in*

*practice* to do or carry out." THE NEW OXFORD AMERICAN DICTIONARY 849 (2d ed. 2005) (emphasis added); *see also* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 625 (11th ed. 2003) ("[I]ncapable of being performed or accomplished by the means employed or at command").[11]   Several factors determine numerosity including, but not limited to: "the number of class members, the location of the members of the proposed class, the size of the individual claims, and the nature of the action." *King*, 84 Fed. Cl. at 123-24 (citing 7A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, FEDERAL PRACTICE & PROCEDURE (WRIGHT, MILLER, & KANE) § 1762 at 177, 206-07 (3d ed. 2005)

As a matter of law, the number of putative class members is a substantial factor in establishing numerosity. *King*, 84 Fed. Cl. at 124 ("[T]he number of potential class members is persuasive when determining numerosity"). In this case, Plaintiffs place great emphasis on the dicta in *King* that "generally, if there are more than forty potential class members, this prong has been met." *Id.* (citing *Stewart* v. *Abraham*, 275 F.3d 220, 226-27 (3d Cir.2001)). Plaintiffs argue that *King* requires a presumption of numerosity whenever a Plaintiff can evidence a potential class of over forty members. Pl. Mem. at 6. Plaintiffs, however, afford no weight to the prior statement in *King*: "While not outcome determinative[.]" 84 Fed. Cl. at 124. Moreover, the treatise on which *King* relied, states that "[*t*]*here are no rigid numerical tests* for measuring impracticability of joinder." 5 James Wm. Moore, MOORE'S FEDERAL PRACTICE § 23.22[1][b] (3d ed. 2004) (emphasis added). Therefore, the *King* dicta is only a "general guideline" of the numeric ranges that have satisfied some courts as to the numerosity requirement. *Id.* The United States Court of Federal Claims, however, has not uniformly adopted a presumption approach to numerosity. *Jaynes* v. *United States*, 69 Fed. Cl. 450, 454 (2006) ("The [c]ourt declines to formally adopt a "presumption" approach to numerosity."). There is no "magic number" that once attained, triggers a presumption of numerosity. *Fauvergue*, 86 Fed. Cl. at 96 ("The court has not created a 'magic number' number that, once overcome, raises a presumption that numerosity is satisfied."). Moreover, such an approach would be contrary to the United States Supreme Court's holding in *General Tel. Co. of the Northwest, Inc.* v. *Equal Employment Opportunity Commission*, 446 U.S. 318 (1980), that "[t]he numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." *Id.* at 330; *see also* MOORE'S FEDERAL PRACTICE § 23.22[1][b] ("To the extent that any 'presumption' effectively alters the burden of proof on the numerosity requirement, the 'presumption' approach seems questionable and overly rigid compared to the generally accepted approach that numerical guidelines exist but are not controlling.").

All of the 51 potential class members in this case appear to satisfy the requirements of joinder under RCFC 20.[12]   For this reason, the court to date has allowed Plaintiffs to add 15

---

[11] Unless a term is defined by statute, it should be given its ordinary, contemporary, common meaning which may be informed by dictionary definitions. *McGee* v. *Peake*, 511 F.3d 1352, 1356 (Fed. Cir. 2008).

[12] RCFC 20 states:

(a) Persons Who May Join or Be Joined.

other plaintiffs to this action.  First Am. Compl. ¶¶ 5-19.  The record, however, does not establish that joinder of the remaining potential plaintiffs in this case is impracticable.  As the Government observed, the United States Court of Federal Claims and its predecessor frequently have managed cases with large numbers of claimants without the need to resort to class action.  *Jaynes*, 69 Fed. Cl. at 454-55 (holding that a potential class of 256 members did not satisfy numerosity); *see also Buchan*, 27 Fed. Cl. at 224  ("This court, however, has never had difficulty dealing with hundreds of party plaintiffs or with single plaintiff "test" cases."); *O'Hanlon* v. *United States*, 7 Cl. Ct. 204, 206-207 (1985 ) (holding joinder appropriate for 39 potential plaintiffs.)

In addition, "the ease of identifying [class] members and ascertaining their addresses, the facility of making service on them if joined, and their geographic dispersion" are all factors in the numerosity determination.  *Jaynes*, 69 Fed. Cl. at 454.  The vast majority of potential plaintiffs reside in close geographic proximity to each other and the land at issue in this case.  Pl. Reply to Sur. at 6 ("It is true that a small subset of landowners adjacent to the railroad corridor have mailing addresses outside of the state of Iowa.").  This counsels against a finding of a numerosity.  *Jaynes*, 69 Fed. Cl. at 454 (holding that because 81 percent of the potential plaintiffs lived in the same state, the geographic proximity factor must "weigh heavily" in its numerosity analysis).  In addition, the potential Plaintiffs who reside outside of the state of Iowa appear to be readily available through a search of public records.  Pl. Ex. A.  Therefore, to date there has been no evidence that service of process on potential plaintiffs would be impracticable.

The court recognizes that class certification serves the interests of judicial economy and provides, in some cases, the most effective means for potential plaintiffs to adjudicate their claims.  These arguments, however, are more appropriately considered in evaluating the superiority requirement of RCFC 23.  *Barnes,* 68 Fed. Cl. at 499 ("Essentially, under [the superiority] prong of the analysis, the court is obliged to conduct a cost/benefit analysis, weighing any potential problems with the manageability or fairness of a class action against the benefits to the system and the individual members likely to be derived from maintaining such an action."); *see also Curry* v. *United States*, 81 Fed. Cl. 328, 337 (2008) (adopting *Quinault's* [453 F.2d at 1276] determination that the "claims of many allottees are so small that it is doubtful that they would be pursued other than through this case," as part of the superiority analysis); *Fisher* v. *United States*, 69 Fed. Cl. 193, 205 (2006) (considering the relative size of potential individual claims under the superiority requirement).

For this reason, the court has determined that any efficiencies Plaintiffs argue would be gained by a class action, can be achieved through joinder.  Although some potential plaintiffs may elect to retain different counsel or proceed individually, as a matter of law, that factor is not dispositive.  *Haggart*, 89 Fed. Cl. at 530 ("This approach resembles permissive

---

(1) Plaintiffs. Persons may join in one action as plaintiffs if:
    (A) they assert any right to relief jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
    (B) any question of law or fact common to all plaintiffs will arise in the action.

joinder in that it requires affirmative action on the part of every potential plaintiff.") (quoting *Buchan*, 27 Fed. Cl. at 223).   In addition, any other takings claims arising out of Thornton NITU would be assigned as a directly related case under RCFC 40.2, avoiding any conflicting opinion at the trial.

Accordingly, the court has determined, considering all the relevant factors to the numerosity analysis, that Plaintiffs at this early juncture in the case, have failed to prove by a preponderance of the evidence, that joinder is impracticable.   As such, adjudication of the remaining elements of RCFC 23 is unnecessary.   *Testwuide*, 56 Fed. Cl. at 761 (2003).

## V.       CONCLUSION.

For these reasons, the court has determined that Plaintiffs have failed to establish, by a preponderance of the evidence, that the potential class is so numerous that joinder of all members is impracticable.   Accordingly, Plaintiffs' May 14, 2009 Motion To Certify Class Action is denied.

**IT IS SO ORDERED**.

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Judge**